STATE MEDICAL SOCIETY OF WISCONSIN, Appellant, v. COMMISSIONER OF INSURANCE, Respondent.

*No. 573 (1974). Argued September 8, 1975.—Decided October 2, 1975.*

(Also reported in 233 N. W. 2d 470.)

For the appellant there was a brief by *Tinkham, Smith, Bliss, Patterson & Richards* of Wausau, attorneys, and *Murphy, Stolper, Brewster & Desmond, S. C.* of Madison and Appleton, and *John A. Kluwin* of Milwaukee, of counsel, with oral argument by *Richard P. Tinkham.*

For the respondent there was a brief by *Bronson C. La Follette*, attorney general, and *John E. Armstrong*, assistant attorney general, and oral argument by *E. Weston Wood*, assistant attorney general.

HANLEY, J. Three issues are presented for review:

1. May SMS legally convert its WPS division into a ch. 611, Stats., domestic insurance corporation?

2. Is a denial of this conversion a violation of the equal protection of law?

3. Is a denial invalid as based on legislation impairing the obligations of contract?

*Question of conversion.*

SMS and the respondent concur on this appeal with the reviewing court's assessment that SMS could organize a subsidiary corporation for the conduct of an insurance business. This general proposition is true, but it must be clarified in order to demonstrate the error in petitioner's reasoning justifying its proposed action in regards to WPS.

The powers of SMS are currently propounded in sec. 148.01, Stats.:

"**State society.** (1) The state medical society of Wisconsin is continued with the general powers of a corporation. It may from time to time adopt, alter and enforce constitution, by-laws and regulations for admission and expulsion of members, election of officers, and management."

The society was incorporated in the year 1841 pursuant to Laws of 1841, Bill No. 53, ch. 2, sec. 1. Later statutes contained provisions for SMS to be continued with the general powers of a corporation.

Petitioner SMS contends that it is not "a unique organization," as assessed by the trial court. It finds little distinction in being a nonprofit association, holding a charter from the state and being cloaked with the general powers of a corporation. Whatever the number of

entities which might be found to exist under each category, suffice it to say, that it is a rare organization that possesses all three attributes plus a history of statutory enactments reaffirming its existence and granting it special powers. It is the grant of one such privilege, enabling the WPS plan that provoked the appeal here. Sec. 148.03, Stats., provided:

"**Nonprofit plans for sickness care.** (1) The state society, or a county society in manner approved by the state society, shall have the power to establish in the state or in any county or counties therein, a nonprofit plan or plans for the sickness care of indigents and low income groups, and others, . . ."

The language employed in sec. 148.01, Stats., was the acknowledged model for the legislative enactments empowering similar societies for state dentists, sec. 447.11; pharmacists, sec. 450.12; and optometrists, sec. 449.13; with the modification that their powers be that of a "domestic nonstock corporation." Of the three organizations, only the dentists had a chartered society prior to the adoption of art. IV, sec. 31 of the Wisconsin Constitution. *See:* Ch. 462, Private and Local Laws of Wisconsin, 1871. The adoption of that constitutional provision prohibited the legislature from enacting special or private laws ". . . granting corporate powers or privileges, except to cities." The granting of corporate powers to the optometrists and pharmacists and the reaffirmation of the broad powers and grants of special operations to the state medical and dental societies would be an affront to this constitutional restriction, if we accept petitioner's contention that it is just an ordinary corporation. This is so because:

"Early authorities in Wisconsin construed the constitutional prohibition to relate only to the grant of a corporate charter for the creation of corporate powers and privileges or the addition of charter powers to an exist-

ing corporation. [citations omitted]" *State ex rel. Warren v. Reuter* (1969), 44 Wis. 2d 201, 227, 228, 170 N. W. 2d 790.

Every act of the legislature, however, is entitled to a presumption of constitutionality. *Id.* at 211. This court has recognized that the purpose of art. IV, sec. 31 is to insure that legislation will promote the general welfare and further statewide interest, as opposed to private concerns. *State ex rel. La Follette v. Reuter* (1967), 36 Wis. 2d 96, 113, 153 N. W. 2d 49; *State ex rel. Warren v. Nusbaum* (1973), 59 Wis. 2d 391, 208 N. W. 2d 780. The *Nusbaum Case* reiterates that the legislature may grant limited corporate powers to the entities it creates to promote a public purpose, as is the situation for the optometric and pharmaceutical associations. The addition of the power to conduct nonprofit plans to the state medical and dental societies is more in the nature of a franchise than the grant of corporate power, and the constitution should not be construed to prohibit the grant of a power which the entity could arguably exercise in fact under its general corporate powers. *State ex rel. Warren v. Reuter, supra,* at 228.

There is no basis, therefore, for SMS to deny that it is unique and charged with a public interest. To contend that the uniqueness lies only in its WPS division is to ignore the fact that possessing authority over the legislatively empowered division is notable in itself. SMS has recognized the particular necessity of the special grant. In a history of the society's efforts in the health plan areas, submitted by SMS in connection with the ch. 611, Stats., application, the following comment regarding the creation of the health plan power (ch. 350, Laws of 1935) was made in a report of the special committee on the distribution of medical services.

"One of the reasons for difficulty in perfecting arrangements . . . for the care of the indigent sick, was the

failure of the charter law of the State Medical Society definitely to grant to the Society . . . power to enter into such contracts. Contracts were entered into by three component societies . . . , but lack of definite authority was not conducive to securing that attention and cooperation of the public which otherwise might have been had." Wisconsin State Medical Journal (Oct. 1935), p. 762.

What is the extent of the power, then, that sec. 148.01, Stats., contemplates? A guide by analogy is found in 42 Op. Atty. Gen. (1953), 333. In an opinion addressed to the late MARVIN B. ROSENBERRY, former chief justice of the Wisconsin Supreme Court, in his capacity as chairman of the special committee on the constitution and by-laws of the state historical society, the attorney general reviewed the application of the newly created sec. 181.76 (4):

"(4) A domestic corporation without stock which is not subject to ch. 181 and which does not elect to become subject to it, may conduct and administer its business and affairs under the provisions of ch. 181 *to the extent that the provisions of ch. 181 are not inconsistent* with the articles or form of organization of such corporation or with any provisions elsewhere in the statutes or under any law relating to such corporation." (Emphasis added.)

to entities organized under special legislative act, such as SMS. The entity under study, the state historical society, had been created by a special act, had been "continued" in its powers through various statutes, and "[f]rom time to time specific statutory powers of the society [had] been broadened by legislative act . . . ." *Id.* at 336. In short, its history mirrored that of SMS.

In discussing this "private corporation with a public purpose," the attorney general noted:

"There is nothing inconsistent, however, between the limitations hereinbefore discussed [the necessity of specific grants to this public purpose entity of powers

which ordinary corporations exercise without such grants] and the exercise of the powers granted by sec. 181.76 (4) . . . . Hence it 'may conduct and administer its business and affairs under the provisions of ch. 181 to the extent that the provisions of ch. 181 are not inconsistent . . . with any provisions elsewhere in the statutes or under any law relating to such corporation.' " *Id.* at 336.

The above opinion is consistent with the trial court's assessment that generally petitioner SMS may avail itself of the numerous powers of a corporation. It would be more correct to add that such utilization of power is not the action of an ordinary corporation, but is an exercise subject to the restraints of existing statutes and conducted in an atmosphere charged with public interest. *See:* 42 Op. Atty. Gen. (1953), 333, 336; 63 Op. Atty. Gen. (1974), 48.

The question to be answered is whether SMS may transfer the assets, contracts and liabilities it had accumulated functioning under sec. 148.03, Stats., to another corporation.

Under special statutory provisions, WPS has become one of the largest providers of health and accident coverage in Wisconsin, with a premium income of $50,729,011, assets of $33,336,370, and a surplus of $9,772,150 as of June 20, 1973.

The main functions of SMS lie in administering the WPS plan, tending its internal affairs (including publication of the Wisconsin Medical Journal, co-ordinating a student loan fund and charitable foundation and employees' pension plan) and acting as a contract agent for various federal health plans. These activities need not preclude it from entering the disability insurance field where it has accrued some expertise. The Commissioner of Insurance certainly has the power to accept petitioner's application to enter the disability field if the provisions of sec. 611.13 (3), Stats., are satisfactorily

met. Such acceptance and any operative controls governing the conduct of the new insurer lie in the operation of the commissioner's discretion in light of particular composition and current undertakings of SMS.

The commissioner's discretion, however, is foreclosed from permitting the WPS to be the basis for this proposed ch. 611, Stats., insurance company. This restriction on the normal corporate power "To . . . exchange, transfer and otherwise dispose of all or any part of its property and assets," sec. 181.04 (5), in regards to the sec. 148.03, health care plan arises because that power is both expressly and impliedly inconsistent with other statutory provisions.

Jurisdiction of the commissioner adheres initially because of sec. 611.13 (3) (a), Stats. Of more immediate concern is the jurisdiction conferred as to sec. 148.03. Sub. (2) provides:

"Such plans shall be governed by ss. 200.26 and 204.31 (3m) and by no other law relating to insurance unless such law is referred to in ss. 200.26 and 204.31 (3m) and no law enacted after June 16, 1974 shall apply to such plans unless they are expressly designated therein or refer to such organizations as are responsible for the operation of such plans."

Sec. 200.26, Stats., lists the applicable laws:

"**Nonprofit service plans.** (1) DEFINITION. As used in this section unless the context clearly implies otherwise: 'Organization' means any society, organization or corporation, operating a plan of sickness care *as permitted* by ch. 148, hospital service as permitted by s. 182.032, or a plan of dental care as permitted by s. 447.13, or a prepaid prescription plan as permitted by s. 450.13, or prepaid optometric service plans as permitted by s. 449.-15; *but when any such plan is operated by any division or agency of any such society, organization or corporation then the term 'organization' means only such division or agency.*

". . .

"(4) SUBJECT TO INSURANCE LAWS FOR CERTAIN PUR-POSES. Such organizations and their agents, plans and contracts are subject to s. 201.045 relating to licensing, ch. 207 relating to unfair methods of competition and unfair or deceptive acts or practices, s. 209.04 (11) relating to agents, *ch. 601 relating to the administration of the insurance laws,* ch. 620 relating to investments and to ch. 645 relating to delinquency proceedings, to the same extent and in the same manner as if such organizations were domestic insurance corporations. Such organizations are also subject to s. 201.18 (1) relating to premium reserves except that where risks are written for more than one month and the premium or fee is paid on a monthly basis, the reserve shall be computed at 50% of the monthly premium or fee received each month." (Emphasis added.)

and acknowledges jurisdiction to the commissioner, whose responsibility is as follows:

"601.41 **General duties and powers.** (1) DUTIES. The commissioner shall administer and enforce the insurance laws. He shall act as promptly as possible under the circumstances on all matters placed before him.

"(2) POWERS. The commissioner shall have all powers specifically granted to him, or reasonably implied in order to enable him to perform the duties imposed on him by sub. (1)."

What law must the commissioner enforce that prohibits petitioner's action in regards to WPS? The grant empowering SMS to undertake the health care plan now known as WPS is clear and unambiguous:

"The state society . . . shall have the power to establish . . . a *nonprofit* plan or plans for the sickness care of indigents and low income groups, and others. . . ." (Emphasis added.) Sec. 148.03, Stats.

SMS has conceded that:

". . . This [added charter privilege] is a special power not included under the general powers of a corporation. No corporation other than SMS or a county medical so-

ciety may establish such plans. But for the legislative authorization contained in sec. 148.03, SMS could not have established a nonprofit sickness care plan." (Appellant's brief, p. 19.)

Besides acknowledging the unique status of petitioner vis-a-vis its subsidiary WPS, that accurate characterization plus the foregoing statute yields two principles governing the existence of the plan: (1) It must be maintained on a nonprofit basis; (2) plans established under sec. 148.03, Stats., must be maintained exclusively by SMS or by a county medical society in a manner approved by SMS. As the reviewing court noted, the proposed transfer of WPS to a corporate vehicle of broad flexibility would divest SMS of the dual responsibilities it assumed by utilizing the sec. 148.03 franchise.

SMS would deny the responsibilities inherent in the grant. Initially it labels the franchise "permissive." The language, "shall have the power to establish" is obviously "permissive;" that does not mean, however, that the incumbent responsibilities are also "permissive." Acceptance of the option is acceptance of its conditions. SMS then sees no conditions beyond those imposed on the county society and those imposed on the commissioner under sec. 200.26, Stats., relating to the application of insurance law.

The "nonprofit" requirement is clearly stated. The impairment of assignability is of more subtle derivation. This aspect, while not commanding that WPS must remain in operation forever, does require that SMS solely be responsible for plans created under sec. 148.03, Stats. Although this unassignability is not in the grant's specific terms, that which is intended and implied is as much a part of the statute as that which is expressed. *State ex rel. McGrael v. Phelps* (1910), 144 Wis. 1, 8–10, 128 N. W. 1041. The legislative intent of the enactment must be discerned in evaluating whether the "power to establish" health care plans included the power to freely trans-

fer them. In such a search, the established rule is that recourse may be had to the scope, history, context, subject matter and object intended to be remedied by the act. *Ortman v. Jensen & Johnson, Inc.* (1975), 66 Wis. 2d 508, 520, 225 N. W. 2d 635. Although the enabling grant existed since 1935 (ch. 350, Laws of 1935), SMS did not implement the statewide plan now known as WPS until after the amendments contained in ch. 494, Laws of 1945. These amendments included the addition of sec. 148.01 (3) (d), which read in part:

". . . nor shall any provision of chapter 148 be construed to apply to any corporation, association, or organization not a body corporate under said chapter."

Besides repeating "power to establish" language, the re-created ch. 148, Stats., contained guidelines for the operation and maintenance of such plans. Comments explaining the amendment affirmed the exclusivity of the control of such plans, and passage was secured despite proposed alterations denying the exclusivity. (*See* Amendment No. 1, A., to Amendment No. 1, S., to Bill No. 524, A. (1945) ; Amendment No. 2, S., to Bill No. 524, A.; Amendment No. 4, A., to Amendment No. 1, S., to Bill No. 524 A.)

The exclusivity provision was deleted by ch. 602, Laws of 1959. Explanatory comments to that chapter indicate that its purpose was to bring uniformity and administrative control to the comparatively unregulated plans embodied in ch. 148, Stats., and sec. 182.032 (hospital service care plan). Thus, cross references to the forerunner of the present sec. 200.26 replaced the statute sections dealing with operational guidelines, including sec. 148.01 (3) (d). The jurisdiction of the commissioner and the power to dissolve pursuant to ch. 181 (later repealed and replaced by the provisions of ch. 645, secs. 23, 24, ch. 337, Laws of 1969) were provided. The continued references in sec. 200.26 from its inception to the present time

to plans "permitted by ch. 148," a chapter devoted solely to SMS and the county societies, is convincing evidence that the replacement statute was not intended to alter the exclusive authority of SMS over its health plan.

In the alternative, SMS contends that the form of its proposed ch. 611, Stats., corporation would keep intact the responsibilities charged to its administration of WPS. The reviewing court disagreed. We think the assessment was accurate. The court was also correct in noting that SMS assets, other than those in the WPS, would no longer be available to policyholders of the new corporation; of more importance is the fact that WPS assets and structure, accumulated through years of operation under ch. 148, would now be a vehicle capable of frustrating the legislature's intent. SMS does not assert that the vehicle's structure cannot be changed to void the proposed "sterilization" (the application contained articles of incorporation providing no dividends and distribution of net assets to the two state medical schools upon liquidation). SMS would hold the capital stock, upon which there is no restriction of transfer.

We think the commissioner is without discretion to allow the transfer of ch. 148, Stats., assets to a ch. 611 corporation, for those assets "shall be governed by ss. 200.26 . . . ." Sec. 148.03 (2). No reference having been made in sec. 200.26, as to ch. 611, no accessibility for ch. 148 assets can be implied through the general power of SMS to sponsor a separate corporation under that law.

It is important to note that the course petitioner attempts has been provided for in the enactments of other service plans. The state dental society, for example:

". . . may (a) establish a nonprofit dental care plan within its corporate structure, (b) approve for itself and its members a dental care plan established by a nondental organization, when the society finds a plan of the latter type to be in the public health interest, or (c) organize a

corporation with authority to establish a nonprofit dental care plan, which corporation shall be subject to subs. (1) and (3)." Sec. 447.13 (5), Stats. *See also:* Sec. 450.13 (4), sec. 449.15 (4) and (5) and sec. 182.032 (5).

The modified powers given in the grants to the other societies could have been given to SMS by amendment of its enabling act. Enlargement of SMS's powers is in the area this court should leave to the legislature. In so doing, the petitioner is not thereby forced to operate its sickness care plan indefinitely in its present form. Internal changes and reorganizations can be made so long as they do not transform WPS or any other ch. 148 plan into anything but an arm of the corporate SMS or county societies. Elective dissolution of WPS may be had via the provisions of sec. 645.41 (10), as provided by sec. 200.26 (4). That procedure insures the nonprofit requirement by distribution of excess assets to the common school fund under sec. 645.72.

*Constitutional rights.*

Without amplification, petitioner claims the denial of its application constituted a denial of the equal protection of the law as guaranteed by amendment XIV, sec. 1, Constitution of the United States of America, and, by implication, art. I, sec. 1, Constitution of the State of Wisconsin. The action also, SMS asserts, resulted in a construction of law impairing the obligation of contract contrary to art. I, sec. 10, Constitution of the United States of America and art. I, sec. 12, Constitution of the State of Wisconsin if based on statutes passed subsequent to petitioner's charter.

It has been established that SMS is a unique entity, as is its WPS plan. Nevertheless, the provisions of ch. 181, Stats., have been applicable to petitioner's general operations, except when they conflict with the more specific and appropriate regulations regarding WPS. These regulations include the express and implied conditions of

the grant and those statutes by which ch. 148 plans are to be solely governed. Enforcement of these regulations in the face of petitioner's contrary intentions is a denial of equal protection only if it is shown that the legislature has no proper basis for the classification made, *i.e.*, health care plans in existence via ch. 148. *State ex rel. Real Estate Examining Bd. v. Gerhardt* (1968), 39 Wis. 2d 701, 709–711, 159 N. W. 2d 622. The burden of such a showing is on petitioner, in the face of the presumption of constitutionality for such laws. *Omernik v. State* (1974), 64 Wis. 2d 6, 18, 218 N. W. 2d 734. There is a complete failure of proof as to how the legislative scheme surrounding the health care plan violates the equal protection clause. To the contrary, the grant of the option to implement health care plans to the highest medical society of the state, with the option subject to continuing regulations acknowledging its uniqueness and precluding the unwise application of more general statutes, admits of the highly reasonable purpose, promotion of the public health, upon which the classification is based. A denial of equal protection has not been shown to exist.

No impairment of the charter of SMS has resulted by the action of the legislature. The grant in ch. 148, Stats., was permissive and voluntarily exercised by SMS. In its general operations, petitioner is free to exercise all powers implied in its corporate existence. Thus, the charter, a contract, *Attorney General v. Railroad Companies* (1874), 35 Wis. 425, 563, is not impaired. SMS contends that impairment exists because it cannot exercise the normal corporate power to transfer "its assets." The WPS is not "its assets" which it may deal with as it pleases. The ch. 148 grant is the nature of a franchise. A statute conferring a franchise will not be viewed as a contract unless expressly provided. *Chapin v. Crusen* (1872), 31 Wis. 209, 214. Neither is such a franchise irrevocable or unalterable, for it would be a delegation of inalienable legislative power. *State ex rel. Cream City Ry.*

*Co. v. Hilbert* (1888), 72 Wis. 184, 192–194, 39 N. W. 326.

In the absence of any specificity of how legislation impaired a contract we think that the general allegations fall within the following principles of *Home Building & Loan Asso. v. Blaisdell* (1934), 290 U. S. 398, 54 Sup. Ct. 231, 78 L. Ed. 413. That case, called a "comprehensive restatement of the principles underlying the application of the contract clause," *El Paso v. Simmons* (1965), 379 U. S. 497, 508, 85 Sup. Ct. 577, 13 L. Ed. 2d 446, explained:

" 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, . . .' " *Blaisdell, supra,* at page 437.

We conclude that the reviewing court was correct in affirming the commissioner's determination that he had no power to permit SMS to proceed with its proposal.

*By the Court.*—Judgment affirmed.