STATE of Wisconsin EX REL. Robert C. CANNON, John A. Decker, Robert M. Curley, Leander J. Foley, Jr., Robert W. Landry, Hugh R. O'Connell and Christ T. Seraphim, Relators, and each in his own right, individually, Plaintiffs-Respondents,

v.

J. Denis MORAN, individually and in his official capacity as Director of State Courts, Gary Gates, individually and in his official capacity as Secretary of the Department of Employe Trust Funds; and Kenneth Lindner, individually and as Secretary of the Department of Administration (all of said administrative agencies being of the State of Wisconsin), Defendants-Appellants,

ASSEMBLY COMMITTEE ON ORGANIZATION,
Intervenor-Appellant.†

Court of Appeals

No. 81–420. *Argued October 28, 1981.—Decided May 25, 1982.*
(Also reported in 321 N.W.2d 550.)

† Petition to review granted. ABRAHAMSON, J., took no part.

For the defendants-appellants there were briefs by *Frank J. Pelisek* and *Michael E. Hussman* and *Michael, Best & Friedrich* of Milwaukee and oral argument by *Frank J. Pelisek.*

For the plaintiffs-respondents there was a brief by *Stewart G. Honeck* of Milwaukee, and oral argument by *Stewart G. Honeck.*

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

GARTZKE, P.J.   This is an appeal from a judgment declaring that ch. 38, Laws of 1979, is invalid as to plain-

tiffs because it impairs the retirement contract of each plaintiff and deprives each plaintiff of property without due process of law.[1] The plaintiffs-respondents are

---

[1] Chapter 38, Laws of 1979, provides in material part:

SECTION 1. **Legislative purpose.** The legislature finds that the payment of retirement benefits to public employes by Wisconsin public employe retirement systems results in a fortuitous, unseemly and unintended large increase in the effective rate of compensation the public employes receive for their service to the public. This occurrence imposes unintended costs upon the Wisconsin public employe retirement systems, discriminates against and discourages public employes performing comparable service, results in the unnecessary expenditures by public employer for employment compensation, stimulates inappropriate and spurious transfer and loss of experienced public employes and undermines the confidence of the public in their civil servants. The purpose of this act is to reduce the costs imposed upon the Wisconsin public employe retirement systems and the public employers, to restore equity of compensation among public employes, to remove the incentive for inappropriate transfers between public employers and to restore public confidence in civil servants by discouraging and ameliorating the practice of public employes accepting retirement benefits paid by Wisconsin public employe retirement systems while receiving an adequate salary.

. . . .

SECTION 5. Subchapter IX of chapter 40 of the statutes is created to read:

CHAPTER 40

SUBCHAPTER IX

EMPLOYMENT OF RETIRED EMPLOYES

40.90 **Definitions.** In this subchapter:

(1) "Elected official" means:

(a) A supreme court justice, court of appeals judge, circuit court judge or a state, county, municipal, school district or other public official elected by the vote of the people; or

(b) A person appointed as provided in ch. 17 to fill a vacancy in a position as specified in par. (a).

(2) "Employe" means an employe of a governmental unit.

judges, either of the Wisconsin Court of Appeals or the Circuit Court for Milwaukee County. Chapter 38, Laws of 1979 (which created secs. 40.90–.96, Stats. 1979–80),

(3) "Governmental unit" means the state or any other unit of government or instrumentality of 2 or more units of government within the state.

(4) "Pay" means the gross amount paid to an employe as salary or wages for personal services rendered to or for a governmental unit, including amounts provided through deferred compensation or tax shelter agreements but excluding overtime compensation. For the purposes of this subsection, the gross amount paid shall be determined prior to deductions for taxes, insurance premiums, retirement contributions or deposits, and charitable contributions or similar amounts.

(5) "Retirement benefit" means a series of periodic payments payable on retirement of an employe under ch. 41 or 42 or chapter 201 or 396, laws of 1937. Retirement benefit does not include any portion of a benefit derived from voluntary additional contributions by the employe. For the purposes of this subsection, the amount of retirement benefit shall be determined prior to any deductions for taxes, insurance premiums, or other deductions which reduce the amount of benefit actually paid.

40.91 **Wages reduced to offset retirement benefit.** (1) Notwithstanding any other law, an employe who is occupying a position for which the rate of pay per month is over the dollar base and who also receives retirement benefits shall have his or her gross monthly pay reduced, but not below the dollar base, by the lesser of:

(a) The amount of the gross monthly retirement benefits the employe receives; or

(b) The amount determined by dividing the product of the gross monthly pay which is in excess of the dollar base times the monthly retirement benefit by the dollar base.

(2) For the purpose of sub. (1), the dollar base is $1,667 from the effective date of this act (1979) through December 31 of the 2nd calendar year commencing after the effective date of this act (1979). The department shall establish the dollar base for each subsequent calendar year by multiplying the dollar base for the previous calendar year by the percentage increase in the average of all earnings paid during the preceding calendar year over the average of all earnings paid in the next preceding calendar year to

reduces the salary payable to each plaintiff for current service to the State of Wisconsin by an amount equal to the full pension benefit each currently receives from the Milwaukee County Employees Retirement System.

The issues are whether ch. 38, Laws of 1979, is unconstitutional as to plaintiffs for the reasons relied on by the trial court and whether ch. 38 violates the equal protection provisions of the United States and Wisconsin Constitutions.[2] We hold that ch. 38, Laws of 1979, is constitutionally valid as to the plaintiffs. We therefore reverse the judgment.

### 1. *Statutory Background*

According to the Joint Committee on Retirement Systems, ch. 38, Laws of 1979, was enacted "to limit the total compensation that the public employees of this state may receive from public retirement systems and wages for current public employment. The term 'double-dipping' is sometimes applied to employees who are receiv-

---

participants of the Wisconsin retirement fund who were participating employes throughout both preceding calendar years.

. . . .

40.96 **Applicability.** (1) This subchapter applies to pay received by an employe after the effective date of this act (1979), except as provided by subs. (2) and (3).

(2) Except as provided by sub. (3), this subchapter applies to pay received by an employe who is a public officer for the purposes of article IV, section 26 of the constitution only after the public officer commences a term of office after the effective date of this act (1979).

(3) This subchapter applies to every judge of a court of record and justice of the supreme court on and after the date that any justice of the supreme court or judge of a court of record commences a term of office after the effective date of this act (1979).

. . . .

[2] The Wisconsin Supreme Court denied plaintiffs' petition to bypass the Court of Appeals, pursuant to Rule 809.60.(1), Stats., and refused certification by the court of appeals, pursuant to Rule 809.61.

ing retirement benefits at the same time that they are currently employed."[3]

The legislatively perceived problem, as to these plaintiffs, arises out of the operation of the Milwaukee County Employees Retirement System as affected by the court reform legislation of 1977. Prior to the Court Reform Act, ch. 187, Laws of 1977, the circuit judges in Milwaukee were members of the Milwaukee County Employees Retirement System.[4] Part of their salaries came from the state and part was paid by Milwaukee County.[5] The Court Reform Act abolished the distinction between county and circuit courts and created the court of appeals. Contemporaneous changes in the law made all judges state employees, with salaries paid in full by the state.[6] Milwaukee circuit judges could have a portion of their salary funneled through the county so that they could continue to participate in the Milwaukee County Employees Retirement System to the same extent as they

[3] Report of Joint Committee on Retirement Systems, Appendix to AB 40 at 1 (1979). "Double-dipping" is an unfortunate misnomer when applied to retirees, such as plaintiffs, who are paid deferred compensation for past services and a salary for current services to the public. Plaintiffs and similar retirees receive two government checks, but they are not paid twice for the same services.

[4] Section 1, ch. 201, Laws of 1937, required every county having a population of 500,000 or more to establish a retirement system for county employees.

[5] The circuit judges participated in the Wisconsin Public Employees Retirement System to the extent of their state salaries. Immediately before the Court Reform Act, the state salary was $20,000 per year. The remainder of the judges' salaries was paid by the county and was subject to the Milwaukee County Employees Retirement System.

[6] The salaries are therefore subject to the Wisconsin Public Employees Retirement System. Sec. 753.07(1), Stats., as created by sec. 309, ch. 449, Laws of 1977. County supplements to judicial salaries were abolished July 1, 1980. Sec. 753.071(2).

had before.[7] The alternative was to withdraw from the county retirement system and, if eligible, begin receiving the pension benefits immediately. The decision had to be made on or before November 1, 1978, and would be effective August 1, 1978, the effective date of the Court Reform Act.[8]

Six Milwaukee County circuit judges, five of whom are plaintiffs in this action, elected not to continue with the county plan and to begin receiving county pension benefits.[9] The other two plaintiffs, Judges Decker and Cannon, were elected to the court of appeals and terminated their participation in the county system by resigning from their circuit court judgeships July 31, 1978. They too began collecting their county pension benefits. The monthly pension benefits paid to plaintiffs range from $967.74 to Judge Cannon to $337.65 to Judge O'Connell.[10]

[7] Sec. 753.07(2), Stats. A similar option was extended to persons who had been county court judges in Milwaukee. Sec. 753.-07(3).

[8] Sec. 753.07(5), Stats.

[9] The sixth judge who exercised this option retired January 6, 1980, prior to ch. 38, Laws of 1979, becoming applicable to him. The other incumbents who continued to serve as circuit judges after July 1, 1978, elected to remain participants in the Milwaukee County Employees Retirement System. All of the Milwaukee County judges, who became circuit judges by virtue of the Court Reform Act, also stayed within the Milwaukee County Employees Retirement System.

[10] The pension benefits vary according to the length of time the judge participated in the Milwaukee County Employees Retirement System and the form in which he elected to receive the benefits. The monthly benefit received by each plaintiff from the Milwaukee pension plan is as follows: Judge Cannon, $967.74 to him for life, then to his beneficiary for life; Judge Decker, $756.40 to him for life, then to his beneficiary for life; Judge Curley, $508.74 to him for life, then to his beneficiary for life; Judge Foley, $522.65 to him for life, then to his beneficiary for life; Judge O'Connell, $337.65 to him for life, then to his beneficiary for

Accordingly, each plaintiff received a monthly pension benefit and a full salary as a judge. It was conceded during oral argument that the election to receive pension benefits is irrevocable.

Chapter 38, Laws of 1979, was passed the following year and took effect as to plaintiffs on January 7, 1980.[11] As applied to these plaintiffs, it reduces their state salaries dollar-for-dollar by the benefits they receive under the Milwaukee County pension plan.[12] No legislation has been called to our attention which permits the plaintiffs to undo the effect of their terminated participation in the Milwaukee County Employees Retirement System. We therefore assume that the pension setoff provisions of ch. 38 permanently reduce the plaintiffs' salaries, so long as plaintiffs hold their present positions.

2. *Impairment Of Contract*

The contract clause of the federal constitution, art. I, sec. 10, clause 1, provides that no state shall pass any "law impairing the obligation of contracts." Article I, sec. 12 of the Wisconsin Constitution prohibits the passage of "any law impairing the obligation of contracts." Because the federal and state contract clauses are identical, we look to the decisions of the United States Supreme Court and lower federal courts as well as our state

life; Judge Seraphim, $865.94 to him for life, and after his death one-half that amount to his beneficiary for life; Judge Landry, $743.23 to him for life. The pensions increase two percent per year.

[11] The law applied to judges on or after the date they commenced a term of office after November 1, 1979. Sec. 40.96, Stats. 1979–80, created by ch. 38, Laws of 1979. The parties stipulate that the first judicial term following November 2, 1979 commenced on January 7, 1980.

[12] For purposes of computing state fringe benefits, the judges are treated as if the amount of their state salary was the same as before, unaffected by the retirement benefit offset. Ch. 80, Laws of 1979, creating sec. 40.95, Stats.

supreme court for guidance. *Compare State Medical Society v. Comm. of Insurance*, 70 Wis. 2d 144, 157–59, 233 N.W.2d 470, 478–79 (1975) (federal decisions applied to challenge based on state and federal contract clauses).

The pension setoff provisions of ch. 38 apply to the plaintiffs' salaries. Chapter 38 does not exempt from its setoff provisions government employees whose pension benefits began before the effective date of the legislation. When considering the bill which ultimately resulted in ch. 38, the legislature knew judges were receiving retirement benefits and knew their salaries would be reduced by those benefits if the proposed legislation were adopted.[13] Accordingly, we must examine the constitutionality of ch. 38.

We start with the strong presumption that all state statutes are constitutional. Judicial review of all legislation is subject to the presumption of constitutionality. *Sigma Tau Gamma Fraternity House v. City of Menomonie*, 93 Wis. 2d 392, 414, 288 N.W.2d 85, 95 (1980); *Mack v. State*, 93 Wis. 2d 287, 297, 286 N.W.2d 563, 568 (1980). A challenger has the burden of proving that the statute is unconstitutional beyond a reasonable doubt. *Wis. Bingo Supply & Equipment Co. v. Bingo Control Bd.*, 88 Wis. 2d 293, 301, 276 N.W.2d 716, 719 (1979).

We turn next to the criteria for a successful challenge to state legislation on grounds that it has impaired a contract. The legislation must impair an existing contractual relationship; the impairment must be substantial; and if the impairment is substantial, the purpose of the state legislation must be examined to determine whether the impairment is justified. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244–45 (1978).

---

[13] *See* n. 15, *infra*, and accompanying text.

That a valid contract exists between each plaintiff and the Milwaukee County Employees Retirement System is undisputed.[14] The pertinent facts having been stipulated, whether the state has passed a law impairing the obligation of that contract is a question of law. *Northern Pacific Railway Co. v. Minnesota ex rel. Duluth,* 208 U.S. 583, 590 (1908). An appellate court is not bound by a trial court's conclusions of law. *First Nat. Leasing Corp. v. Madison,* 81 Wis. 2d 205, 208, 260 N.W.2d 251, 253 (1977) ; *Engineers & Scientists v. Milwaukee,* 38 Wis. 2d 550, 554, 157 N.W.2d 572, 574 (1968).

Legislation impairs a contract if it alters the contractual relationship between the parties. *Allied Structural Steel,* 438 U.S. at 240. Impairment may also result from legislation which invalidates, releases or extinguishes contractual obligations, such as changes in remedies available to the parties. *Home Building & Loan Asso. v. Blaisdell,* 290 U.S. 398, 431 (1934). When elaborating upon impairment through changes in remedies, the *Blaisdell* court quoted from *Penniman's Case,* 103 U.S. 714, 720 (1881), to the effect that the legislature may modify remedies to enforce a contract, "provided it does not deny a remedy or so embarrass it with conditions or restrictions as seriously to impair the value of the right." 290 U.S. at 433.

The challenged legislation does not directly affect the terms of the pension contract between a plaintiff and the

---

[14] Chapter 138, Laws of 1945, added sec. 13a to ch. 201, Laws of 1937 (which had mandated creation of the retirement system). Section 13a(2)(a) and (c) provide that every member, beneficiary and future entrant in the system has a "benefit contract" in the system and a vested right to the annuities and benefits in the system which "shall not be diminished or impaired by subsequent legislation or by any other means without his consent."

Milwaukee County Employees Retirement System, or affect the remedy of a plaintiff to enforce his contract. Accordingly, ch. 38, Laws of 1979, has not impaired the contract of each plaintiff.

Plaintiffs contend that impairment has resulted, notwithstanding the lack of direct effect on their contracts or remedies. They rely on the trial court's reasoning that reducing a salary by the amount of a pension is no different from refusing to permit receipt of the pension, and that because ch. 38 renders valueless the benefits of the plaintiffs' pensions, it impairs the obligations of their contracts.

Reducing a public salary by the amount of a public pension is different from preventing receipt of the pension. The factual difference is substantial: the salary is reduced and the pension is not. The difference in law is equally great.

■

In the absence of contractual or constitutional restraints, the legislature may alter public salaries and public pensions at will. *U.S. Railroad Retirement Board v. Fritz*, 449 U.S. 166, 174 (1980) (altering noncontractual federal pension does not take property); *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 575 (1979) (noncontractual federal retirement benefits may be altered or eliminated); *Morrison v. Board of Education*, 237 Wis. 483, 487, 297 N.W. 383, 385 (1941), quoting *Dodge v. Board of Education*, 302 U.S. 74, 78–79 (1937) (legislature may alter public salaries at will). The legislature may therefore determine that a certain relationship should exist between public pension benefits and public salaries received by the same employee.

■

Vesting public employees with contract rights in a pension system does not create other contract rights in their employment. *Morrison*, 237 Wis. at 491, 297 N.W. at

387 (legislature may alter public employee tenure after creating contractual retirement system). Accordingly, vesting government employees with contract rights in a retirement system does not affect the legislature's right to alter their salaries. The legislature consequently may determine that a certain relationship should exist between contractual public pension benefits and public salaries received by government employees. To establish that relationship, the legislature must be free to modify public salaries, even though it cannot modify the pension benefits, and to reduce an employee's salary by the amount of the employee's pension.

We cannot agree that plaintiffs' pension benefits have been rendered valueless by the setoff provisions of ch. 38. Each plaintiff receives the same pension dollars after the effective date of ch. 38 as he did before.

Nevertheless, ch. 38 has decreased each plaintiff's total income, and in that sense it has reduced the value of his pension benefits until he quits his position. We therefore treat the question whether legislation reducing the value of a contract, without affecting its terms, is an impairment for constitutional purposes.

As authority for finding an impairment, the trial court cited *Northern Pacific*, 208 U.S. at 591, where it is said, "[L]egislation which deprives one of the benefit of a contract, or adds new duties or obligations thereto, necessarily impairs the obligation of the contract." We are not convinced that this broad definition of impairment, if read to equate loss of value with impairment, is more than dictum. The *Northern Pacific* court affirmed the judgment of the state court which had held that the contract involved was void. Accordingly, the next question—whether a contract had been impaired—never arose in *Northern Pacific*.

To support the trial court's finding of an impairment, respondents cite *Pawlowski v. Eskofski*, 209 Wis. 189,

193, 244 N.W. 611, 613 (1932). The *Pawlowski* court said that the United States Supreme Court long ago had held that any statute "that operated to deprive a party to a contract antedating the enactment of the statute of any valuable right secured to him by that contract is void as to that contract," citing *Edwards v. Kearzey,* 96 U.S. 595, 607 (1878). The *Pawlowski* court continued, "If a statute substantially lessens the value of a pre-existing contract the constitutional provision bars application of it to the contract," and quoted from *Planters Bank v. Sharp,* 47 U.S. (6 How.) 301, 327 (1848), as follows:

"One of the tests that a contract has been impaired is, that its value has by legislation been diminished. It is not, by the constitution, to be impaired at all. This is not a question of degree or manner or cause, but an encroaching in any respect on its obligation, dispensing with any part of its force."

209 Wis. at 193, 244 N.W. at 613. *Pawlowski,* however, is not on point. *Pawlowski* invalidated legislation which altered the terms of a preexisting contract.

The cases cited in *Pawlowski* do not support the proposition that legislation reducing the value of a contract necessarily impairs the contract. *Edwards, supra,* invalidated a statutory exemption from execution on grounds that a subsequent state law which affects a *remedy* on the contract "as substantially to impair and lessen the value of the contract is forbidden by the Constitution, and is, therefore, void." 96 U.S. at 607. *Planters Bank, supra,* involved the validity of retrospective legislation which rendered notes unenforceable and therefore affected the remedy. Neither *Edwards* nor *Planters Bank* involved legislation which affected the value of a contract as opposed to its terms or enforceability.

Other courts have held that legislation adversely affecting a party to a preexisting contract does not consti-

tute an impairment, unless it modifies the contract or its enforceability. Where bonds were issued, payable from assessments secured by real estate liens, and a state agency subsequently restricted the use of the real estate, the obligations of the parties to the bonds were held not to have been impaired. *Northwestern Nat. Life Ins. Co. v. Tahoe Regional,* 632 F.2d 104 (9th Cir. 1980). *South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646, 680 (1st Cir. 1974), held that if loss of value constituted impairment:

[A]ll governmental action affecting the profitability of private concerns would violate the contracts clause because it would change relative values and make those enterprises the prospects of which were diminished by the legislation somewhat less likely to keep their bargains. We do not understand that this is the import of the contracts clause. We read it as forbidding instead an alteration in the relative position of two parties to an existing contract; once these parties, as between themselves, have allocated rights and responsibilities, it is not within the power of the government to rearrange them. *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 428 . . . (1934) . . . .

The *South Terminal* court therefore held that environmental regulations reducing the value of a construction contract did not impair the contract. *Compare Curtis v. Whitney,* 80 U.S. (13 Wall.) 68, 70–71 (1872) ("Nor does every statute which affects the value of a contract impair its obligation. It is one of the contingencies to which parties look now in making a large class of contracts, that they may be affected in many ways by state and national legislation").

Plaintiffs claim a constitutional right not to have their public salaries "linked" to their contract rights. They contend that the linkage accomplished by ch. 38 substantially alters and therefore impairs their pension contracts.

No precedent has been cited to support the linkage theory of impairment, and we reject it. First, the fact is that no term of the pension contracts has been altered by ch. 38. *Compare Lamb v. Connecticut Gen. Life Ins. Co.,* 643 F.2d 108 (3rd Cir.), *cert. denied,* —— U.S. ——, 102 S. Ct. 139 (1981) (disability insurance policy which offset social security benefits against insurance benefits does not contravene statutory prohibition against assignment, transfer, execution or other legal attachment of social security benefits); *Spitzler v. New York Post Corporation,* 620 F.2d 19 (2nd Cir. 1980) (pension rights protected by ERISA, 29 U.S.C. secs. 1001 *et seq.,* unimpaired by reducing severance benefits not subject to ERISA by value of employee's interest in pension plan covered by ERISA). Second, the linkage theory is inconsistent with the right of the legislature to establish a relationship between public pensions and public salaries.

Plaintiffs' benefit rights are vested by statute. (*See* n. 14.) A statute dealing with substantive rights cannot impair rights vested on its effective date or add new obligations with respect to past transactions, in the absence of justifying circumstances. *State ex rel. Briggs & Stratton v. Noll,* 100 Wis. 2d 650, 655–57, 302 N.W.2d 487, 491 (1981). The *Briggs & Stratton* court invalidated a retroactive increase in worker's compensation benefits for injuries before the effective date of the legislation. That legislation directly affected employers' vested rights by retroactively increasing their statutory obligations. Chapter 38 does not directly affect the vested rights of plaintiffs. Accordingly, vested rights analysis does not change our conclusions as to impairment.

Because we conclude that ch. 38, Laws of 1979, has not been shown to impair plaintiffs' contracts, we do not reach the third stage of impairment analysis, whether the legislation was "reasonable and necessary to serve an important public purpose," *United States Trust Co. v.*

*New Jersey*, 431 U.S. 1, 25 (1977), as in a case of emergency, as required by *Briggs & Stratton, supra.*

### 3. *Deprivation Of Property Without Due Process*

The trial court concluded that ch. 38, Laws of 1979, not only impaired the obligation of their contracts but deprived them of property without due process. Plaintiffs urge that we affirm the trial court because, they contend, ch. 38 retroactively deprives them of property and uses their retirement benefit dollars not only to pay the deferred compensation due them but also to pay for their current salaries.

Section 1 of the fourteenth amendment to the United States Constitution prohibits a state from depriving any person of property without due process of law. The freedoms preserved by art. I, sec. 1 of the Wisconsin Constitution are substantially equivalent to the due process and equal protection clauses of the fourteenth amendment. *Haase v. Sawicki*, 20 Wis. 2d 308, 311 n. 2, 121 N.W.2d 876, 878 (1963), and cases cited.

A retroactive statute is of course "unconstitutional if its effect is to deprive a person of life, liberty or property without due process of law." *Briggs & Stratton*, 100 Wis. 2d at 657, 302 N.W.2d at 491, quoting *Wis. Bingo Supply*, 88 Wis. 2d at 306, 276 N.W.2d at 721. That is true of every statute, whether prospective or retrospective. Retroactivity, alone, does not constitute a denial of due process. It is "clear that legislation readjusting [economic] rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976). Even legislation retroactively depriving a person of property does not automatically deny due process. *Schultz v. Vick*, 10 Wis. 2d 171, 175, 102 N.W.2d 272, 274 (1960). Like pros-

pective legislation, retroactive legislation is presumed constitutional, and the due process test is the same for both types of statutes: whether the legislature has acted in an arbitrary and irrational way. *Usery*, 428 U.S. at 15. Justifications saving the constitutionality of prospective legislation may not, however, suffice when a retroactive statute is challenged on due process grounds. *Usery*, 428 U.S. at 17.

Accordingly, we proceed first to determine if statutory retroactivity exists and then whether ch. 38 deprived plaintiffs of property. Whether retroactive legislation meets the test of substantive due process is not an issue unless the law has retroactively deprived the plaintiffs of property. We conclude that no deprivation has occurred.

Chapter 38 is retroactive legislation as to plaintiffs. The pension setoff provision of ch. 38 applies to and reduces the salaries of the plaintiff judges. When considering the assembly bill which ultimately resulted in ch. 38, the legislature had before it a committee report. The report stated that seven judges were currently receiving Milwaukee retirement benefits and their salaries would be reduced by their benefits if the proposed legislation were adopted.[15] Plaintiffs' assertion that they are those seven judges is not challenged on this appeal.

Chapter 38 is retroactive legislation for purposes of constitutional analysis. A "retroactive statute is one which gives to preenactment conduct a different legal effect from that which it would have had without the passage of the statute." Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 Harv. L. Rev. 692 (1960) (footnote omitted). When each plaintiff terminated his membership in the Milwaukee County Employees Retirement System in 1978, he became

---

[15] Report of Joint Committee on Retirement Systems, Appendix to AB 40 at 6 (1979); Fiscal Note to AB 40 (1979).

eligible for immediate pension benefits with no effect on his salary. Chapter 38 was effective November 1, 1979, and applicable to the plaintiff judges January 7, 1980. Chapter 38 changed the effect of each plaintiff's prior termination by reducing his salary by his pension benefit.

Each pension contract is property. "Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States." *Lynch v. United States,* 292 U.S. 571, 579 (1934). *Accord, Hortonville Ed. Asso. v. Joint Sch. Dist. No. 1,* 66 Wis. 2d 469, 489, 225 N.W.2d 658, 669 (1975), *rev'd on other grounds,* 426 U.S. 482 (1976). The question is whether the plaintiffs have been deprived of that or any other property.

No plaintiff has been deprived by ch. 38 of his pension contract or its benefits. Each contract continues as before. Each plaintiff continues to receive his full pension benefits. We have previously rejected the trial court's logic when it concluded that reducing a salary by the amount of a pension is no different from refusing to permit receipt of the pension. Because the full amount of his pension benefit is deducted from his salary, each plaintiff is no better off now than he would have been without his pension. The deprivation, however, is to his salary and not his contract or benefits, whether or not the value of those benefits has been reduced.

Plaintiffs assert that ch. 38 "credits" the state for salary due them to the extent they receive previously earned deferred compensation. They assert that they are in effect paid twice with the same dollar: once for past service and again for current service. They argue that this takes their pension money for the use of the state to pay public employee salaries, without due process.

Plaintiffs' pensions are indeed "deferred compensation" for their past services. Chapter 138, Laws of

1945, which added sec. 13a(1) to ch. 201, Laws of 1937, expressly so provides. Plaintiffs' deferred compensation is not used, however, to pay for their current services. Section 40.91, as created by sec. 5, ch. 38, provides in relevant part that a state employee whose circumstances are those of the plaintiffs "shall have his or her *gross monthly pay reduced . . . .*" (Emphasis added.)

Plaintiffs do not contend that they, as public employees, have property rights in their salary scale. It is therefore immaterial, for purposes of due process analysis, that their salaries have been reduced.

Because plaintiffs have not demonstrated a deprivation of their property by virtue of ch. 38, we do not decide whether each plaintiff changed his position in reliance on his pension contract and whether, in view of that reliance, the retroactive effect of ch. 38 violates due process.[16]

Our due process analysis in terms of vested rights would reach the same results. See our discussion of *Briggs & Stratton, supra,* in part two of this opinion.

We conclude that plaintiffs have not shown that ch. 38, Laws of 1979, deprives them of property without due process of law.

4. *Equal Protection*

The trial court did not reach plaintiffs' contention that ch. 38 denies them equal protection of the laws, contrary

---

[16] The importance of [the reliance element] is apparent when one considers that in very general terms the two major factors to be weighed in determining the validity of a retroactive statute are the strength of the public interest it serves and the unfairness created by its retroactive operation, and the reliance of the parties on preexisting law is perhaps the most accurate gauge of the latter. . . .

Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 Harv. L. Rev. 692, 727 (1960). *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 17 n. 16 (1976), acknowledges the significance of reliance in at least one line of Supreme Court decisions.

to the fourteenth amendment to the United States Constitution and art. I, sec. 1 of the Wisconsin Constitution. Plaintiffs assert that ch. 38 denies them equal protection by creating an unreasonable classification.

"When a statutory classification is challenged as violative of the equal protection clause, the challenger must prove abuse of legislative discretion beyond a reasonable doubt." *Sambs v. City of Brookfield,* 97 Wis. 2d 356, 370, 293 N.W.2d 504, 511, *cert. denied,* 449 U.S. 1035 (1980).

Because ch. 38 is economic legislation, judicial review does not reach the higher scrutiny required for fundamental constitutional rights, or for "suspect" classifications such as race. *Fritz,* 449 U.S. at 174. In reviewing the reasonableness of a statutory classification, it is not for us to determine whether the legislative decision was sound, equitable or results in some inequalities in practice. *Fritz,* 449 U.S. at 175–76; *Dandridge v. Williams,* 397 U.S. 471, 485 (1970). The test on review of economic or social legislation is whether the statutory classification has some reasonable basis. *Dandridge,* 397 U.S. at 485.

*Harris v. Kelley,* 70 Wis. 2d 242, 252, 234 N.W.2d 628, 632 (1975), identified the following specific standards to measure the reasonableness of a statutory classification:

(1) All classifications must be based upon substantial distinctions which made one class really different from another.

(2) The classification adopted must be germane to the purpose of the law.

(3) The classification must not be based upon existing circumstances only and must not be so constituted as to preclude addition to the numbers included within a class.

(4) To whatever class a law may apply, it must apply equally to each member thereof.

(5) The characteristics of each class could be so far different from those of other classes as to reasonably

suggest at least the propriety, having regard to the public good, of substantially different legislation.

The classes created by ch. 38, secs. 40.90 and 40.91, Stats., consist of (1) government employees who receive a public retirement benefit as defined in sec. 40.90 (5) and more than a minimum monthly salary and (2) government employees who do not receive such a retirement benefit or who receive less than the minimum monthly salary.

Plaintiffs do not assert that this classification fails to meet the *Harris* standards for reasonableness. They argue rather that the third *Harris* standard, which proscribes a closed class or a class based upon existing circumstances only, has been violated. Plaintiffs appear to contend that they are members of a separate class of seven persons which differs from the classification found on the face of the statute. They appear also to contend that the statutory classification describes only the seven plaintiffs.

Plaintiffs contend that the description of the first class, government employees who receive a pension, is incomplete as to them. They assert that on the effective date of ch. 38, a classification existed consisting of current government employees, who then received a public retirement benefit, who were at least fifty-five years of age, and who earned more than $20,000 annually, and that this classification described only the plaintiffs.[17]

Plaintiffs have gone beyond the facial statutory classification to a classification based partly on facts which must be found outside the statute itself. Judicial review

---

[17] Fifty-five is the minimum age for retirement from the Milwaukee County Employees Retirement System. The pension set-off provided by sec. 40.91 applies to earnings in excess of a monthly dollar base of $1,667, or about $20,000 annually. Plaintiffs' salaries as circuit and court of appeals judges substantially exceed $20,000.

on equal protection grounds stops short of the nonstatutory classification plaintiffs have described. In assessing an equal protection challenge, the court is "called upon only to measure the basic validity of the legislative classification." *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 272 (1979). The facts may show a substantial impact on another class from which an invidious legislative purpose may be inferred. *Califano v. Boles,* 443 U.S. 282, 294 (1979) (alleged discrimination on the basis of illegitimacy); *Feeney,* 442 U.S. at 274 (alleged sex discrimination); *Washington v. Davis,* 426 U.S. 229, 238–41 (1976) (alleged race discrimination). That another class may be affected by the legislative classification does not, however, substitute it for the class defined by the legislature for equal protection analysis.

We turn to the contention that as of the effective date of ch. 38, the statutory classification contained a closed class consisting of only the seven plaintiffs. Plaintiffs contend that the third *Harris* standard, which proscribes a closed class or a class based on existing circumstances only, has been violated.[18] According to plaintiffs, it is beyond dispute that they were "the focus of the legislation," and because that focus is retroactive, no other person can be added to their class.

Plaintiffs have not shown a factual basis for the claim that they are the only members of the legislative class. It is undisputed that when ch. 38 was enacted and on its effective date, plaintiffs were the only active judges who received a pension from the Milwaukee County Employees Retirement System. That fact does not demonstrate,

---

[18] The case law does not explain why the third *Harris* standard—a closed class or legislation based on existing circumstances—is applicable to equal protection analysis. The origin of this standard is judicial interpretation of the prohibition against special or private laws found in art. IV, sec. 31 of the Wisconsin Constitution. *See Johnson v. City of Milwaukee,* 88 Wis. 383, 391, 60 N.W. 270, 272 (1894).

nor has it been conceded, that plaintiffs are the *only* members of the legislative class as of the effective date of ch. 38. The record discloses that the legislature had been unable to determine whether state employees other than judges would be immediately adversely affected by the proposed pension setoff.[19] Intentional discrimination against the seven plaintiffs cannot be inferred solely from the legislature's knowledge that they would be adversely affected. *Feeney,* 442 U.S. at 279. Nothing

[19] Plaintiffs' factual assertion that they are the "focus" of the legislative classification rests on a fiscal note prepared by the Director of State Courts. The appendix to AB 40 does not indicate that the only area in which ch. 38 would have a financial impact is the judicial system, but rather that the judicial system is the only area of public employment in which the effect could readily be established. We quote from pages 5 and 6 of that appendix:

The two Milwaukee funds and the DETF [Department of Employe Trust Funds] have all indicated that their records do not reflect the number of current participants who may also be receiving a retirement benefit from another public pension plan of this state. There would appear to be only one area of public employment in which the effect of the "retirement benefit offset" program can readily be established—the judicial system. In a fiscal note prepared by the director of state courts office, it is noted that 11 active judges are eligible to receive benefits from a Milwaukee retirement system, and that 7 are currently receiving such benefits. If the offset program is enacted, state salaries to these 7 judges receiving benefits would presumably be reduced by the gross amount of those benefits—*$55,635* per year.

The state courts office also indicates that 2 reserve judges would be affected by the offset program and the other amendments in this bill, and that these would essentially *increase* salaries paid to 2 reserve judges by about $12,000 annually. This salary increase for reserve judges would reduce the state's salary savings from $55,000 to less than $45,000 annually.

There would, of course, be a cost to the DETF for the administration of the "retirement benefit offset" program. The DETF indicates that one permanent position would be required to manage this program at a cost for a biennium of *$36,900.* (Emphasis in original.)

more in this record indicates purposeful discrimination by the legislature against the seven plaintiffs.[20]

The retroactive nature of ch. 38 as to plaintiffs does not exclude new members from plaintiffs' group. Every person who receives a government pension as defined by ch. 38 joins the plaintiffs' group by taking government employment which pays more than the minimum salary level. Each new member will suffer the same salary reduction as the plaintiffs. That such persons would be discouraged from joining the plaintiffs (one of the purposes of ch. 38) does not close the class.

Plaintiffs assert that whether or not ch. 38 was aimed at them, it has an extremely limited focus. Because it applies only to a narrow class of public employees receiving a public pension and earning over $20,000, plaintiffs assert that the purpose of ch. 38 is invalid because it does not attempt to protect a broad societal interest. The record shows, however, that the protected interest is broader than plaintiffs assume. The report of the legislative committee appended to the proposed legislation discloses a concern with the potential scope of the class to which plaintiffs belong.[21] The classification is not invalidated

---

[20] An earlier legislative attempt to end the practice of "double-dipping" was directed solely at justices, judges and court commissioners. 1977 S.B. 720, sec. 356 and Senate Amendment 3. The Attorney General advised the Senate Committee on Organization that the bill, if enacted, would violate equal protection because the application of the prohibition only to justices, judges and court commissioners was irrational and arbitrary. 67 Op. Att'y Gen. 134 (1978). That this legislation was proposed in 1977 but did not become law is not evidence that ch. 38, Laws of 1979, "focuses" on plaintiffs.

[21] *See* Appendix to AB 40 at 6–7 (1979):

There may now be an incentive for a public employee to retire at the earliest possible time under one public retirement system, in order to accept other public employment resulting in an increase in total compensation. This "double-dipping" phenomenon can be

by failure of the legislature to widen it by, for example, reducing the $20,000 minimum salary. The size of the social or economic class affected is for the legislature, so long as the classification is rationally based and is free from invidious discrimination. *Dandridge,* 397 U.S. at 486-87. *Compare Richardson v. Belcher,* 404 U.S. 78 (1971) (reducing social security disability benefits by worker's compensation benefits to avoid duplicating disability benefits is a rational classification, notwithstanding failure to apply same offset to other forms of compensation for disability).

It is well settled in this state, as elsewhere, that:

As a general rule, in the absence of a suspect classification or a fundamental interest, the question in an equal protection case is whether the legislative classification is arbitrary and without a rational relationship to a legitimate legislative objective. The validity of classification must be sustained unless it is wholly irrelevant to the achievement of that objective . . . .

*In Matter of Guardianship of Nelson,* 98 Wis. 2d 261, 268-69, 296 N.W.2d 736, 739 (1980) (citations omitted). The legitimacy of the legislative purpose as announced in sec. 1 of ch. 38 (*see* n. 1) is undisputed on this appeal. The classification adopted by ch. 38 serves and is rationally related to that announced purpose, notwithstanding the claimed "narrowness" of the adversely affected class.

---

expensive for retirement funds, because a participant starts drawing a pension who otherwise would probably continue in employment and coverage under that fund to a later date. . . .

To the degree that this bill would discourage "double-dipping" by reducing the incentive for said practice, such effect would appear to be good public policy. It should be noted also that the Federal Government has addressed the problem of "double-dipping" in the Federal Civil Service Reform legislation of 1978, and that Wisconsin statutes presently provide offset provisions for reserve judges and court commissioners. Hence, there is a precedent for this legislation.

Accordingly, we conclude that plaintiffs have not shown that ch. 38, Laws of 1979, denies them equal protection of the laws.

5. *Conclusion*

Because we conclude that the United States Constitution and the Wisconsin Constitution have not been shown to have been violated by ch. 38, Laws of 1979, it is our duty to reverse the judgment of the trial court.

*By the Court.*—Judgment reversed.